*470 OPINION OF THE COURT
Martin B. Stecher, J.
At issue here are the consequences of elopement from a mental institution by a voluntary patient; the proper proceedings to retain or discharge such a patient; and the proper or improper uses of a two-physician certificate (Mental Hygiene Law § 9.27).
Carmen A. was admitted to Manhattan State Hospital as a voluntary patient on June 25, 1989. She remained there until March 14, 1991 when she eloped. On the following day, March 15, 1991 she was taken into custody by members of the New York City Housing Police force and delivered to Metropolitan Hospital. The Metropolitan Hospital physicians signed a two-physician certificate (Mental Hygiene Law § 9.27) and returned the patient to Manhattan State Hospital (Hospital) the same day.
Ms. A. remained at Manhattan State until June 24, 1991 when the Hospital, according to its memorandum submitted to the court, reviewed the patient’s status (Mental Hygiene Law § 9.25) and sought her written consent to remain in the Hospital. Ms. A. declined to execute such a consent, according to the Hospital memorandum; but made no request for discharge from the Hospital (see, Mental Hygiene Law § 9.13 [b]).
On that same day June 24, 1991, the Hospital procured a two-physician certificate for the patient’s involuntary admission (Mental Hygiene Law § 9.27). One week later on July 1, 1991 the Hospital moved for an order permitting it to retain Ms. A. clearly within "sixty days” from the date of the so-called involuntary admission (Mental Hygiene Law § 9.33). It is apparent from Mental Hygiene Legal Services’ (MHLS) memorandum dated August 1, 1991 that the involuntary admission to which MHLS refers is the alleged "admission” pursuant to the two-physician certificate issued by Metropolitan Hospital on March 15, 1991.
It is undisputed that on March 14, 1991 Ms. A. was a voluntary patient (Mental Hygiene Law § 9.13) in Manhattan State Hospital. When she eloped on that date, her status as a voluntary patient did not change and was not to change provided she was "located within 24 hours” of her elopement (14 NYCRR 37.5). We are not informed of the hour on March 14, when Ms. A. left the Hospital premises nor are we informed of the hour when she was "located” by the Housing Police or by Metropolitan State Hospital or when she was *471 returned to Manhattan State Hospital. If the time between elopement and being "located” was more than "24 hours” the Hospital had the option of placing her "on leave without consent status” or discharging her (14 NYCRR 37.5 [c]). Being placed on "leave without consent status” would not result in her discharge from the Hospital unless she failed to be returned to the Hospital within "72 hours” after elopement (14 NYCRR 37.5 [d]).
Ms. A. was not placed on "leave without consent” status and properly so, for she was "located” on the following day and returned to Manhattan State Hospital. The phrases "within 24 hours” and "after 72 hours” were intended to mean "by the following day” and "by the third subsequent day,” respectively; simply because time sequences measured to the minute are impractical under such circumstances and were known to be such on promulgation of the regulations. Ms. A. was not discharged and she continued to be a patient of the Hospital from the moment prior to her elopement until and after her return to Manhattan State Hospital.
The two-physician certificate issued at Metropolitan Hospital, on which MHLS relies, was a nullity. Nothing that was done by Metropolitan Hospital or by two of its physicians could alter the patient’s status as a voluntary patient of Manhattan State Hospital. The two-physician certificate issuing out of Metropolitan Hospital thus being a nullity no relief bottomed on that certificate can be obtained.
On June 24, 1991, the Hospital reviewed the patient’s status. Although the reason for the review at that particular point is not given, it is fairly clear from this record that the review was mandated by the provisions of Mental Hygiene Law § 9.25 (a). Ms. A. entered the Hospital as a voluntary patient on June 25, 1989. There is no evidence of what transpired with respect to her status between her admission on June 25, 1989 and her elopement on March 14, 1991; but it is reasonably to be inferred from all of the documents submitted that on or about June 25, 1990 a review of her status was undertaken in accordance with the provisions of Mental Hygiene Law § 9.25, and that the right to retain her as a voluntary patient was undisputed and would go undisputed for another 12 months, that is up to and including June 24, 1991. According to statute (Mental Hygiene Law § 9.25), a further review had to be undertaken at that time.
The statute sets forth in detail the review which is to be *472 undertaken at the end of each 12-month period of a hospital’s retention of a voluntary patient. The statute provides that at the end of each 12-month period: "[t]he director shall review the suitability of such patient to remain in such status, and the mental hygiene legal service shall review the willingness of such patient to remain in such status. Notice of the determination of the patient’s suitability made by the director shall be given to the mental hygiene legal service. If the mental hygiene legal service finds that there is any ground to doubt the director’s determination of the suitability of such patient to remain in a voluntary or informal status or the willingness of the patient to so remain, it shall make an application upon notice to the patient and the director of the hospital, for a court order determining those questions.” (Emphasis supplied.)
Although the director undertook the statutory review there is no evidence the Hospital gave the statutory notice to MHLS. Instead, it dealt with Ms. A. as if she were newly admitted under its own two-physician certificate of June 15, 1991 and proceeded — albeit within seven days — to seek an order of retention for an involuntary patient under the provisions of Mental Hygiene Law § 9.33.
Where a voluntary patient is concerned, the only initiative required of the hospital at the end of a 12-month period, in order to retain the patient, is to give notice to Mental Hygiene Legal Services of the determination made by the director of the hospital of "the suitability of such patient to remain in such status.” It is for MHLS to determine, in the first instance, "the willingness of [the] patient to remain,” or whether there is any ground to doubt the director’s determination of suitability (Mental Hygiene Law § 9.25 [a]); and in the event of unwillingness to remain or doubt as to the patient’s "suitability” (i.e., continued mental illness requiring hospitalization), MHLS is the agency obligated to seek "a court order determining those questions.”
Of course, nothing in Mental Hygiene Law § 9.25 in any way abrogates a voluntary patient’s right, at any time, to seek immediate release by making a written demand therefor (Mental Hygiene Law § 9.13 [b]), in which event the initiative of a court application, to retain the patient, must be undertaken by the hospital director within 72 hours of receipt of such written demand. There is no evidence that Ms. A. made such a demand.
The two-physician certificate issued on June 15, at Manhat *473 tan State Hospital was as much a nullity as was the two-physician certificate issued at Metropolitan Hospital on March 15; but for different reasons. Metropolitan Hospital’s two-physician certificate was, as previously observed, a nullity because another hospital, Manhattan State Hospital, already had jurisdiction over the patient and nothing that Metropolitan could do could alter that jurisdiction. Manhattan State Hospital’s two-physician certificate of June 15, 1991, was the utilization of a procedure which was not available to it.
It is abundantly clear from the statutory scheme of article 9 of the Mental Hygiene Law and particularly section 9.27 that the two-physician certificate mode of admission to a mental hospital is to be utilized only when the hospital does not already have jurisdiction over the patient; that is, when admission to such a hospital is being sought in the first instance, not when the patient is already a patient of that hospital. Thus, subdivision (e) of section 9.27 directs that "[t]he director of the hospital where such person is brought shall cause such person to be examined forthwith by a physician who shall be a member of the psychiatric staff of such hospital * * * and, if such person is found to be in need of involuntary care and treatment, he may be admitted thereto as a patient as herein provided.” (Emphasis supplied.) Similarly, subdivision (i) provides authorization to "peace officers * * * or police officers * * * to take into custody and transport such person to a hospital for determination by the director whether such person qualifies for admission pursuant to this section.” Subdivision (a) permits a hospital director to "receive and retain” (emphasis supplied) a patient. A careful reading of section 9.27 of the Mental Hygiene Law makes it abundantly clear that the two-physician certificate is an inappropriate mode of seeking to retain a patient already confined to a mental hospital.
Despite the failure of the Hospital to follow the notit ? provision of subdivision (a) of section 9.25 of the Mental Hygiene Law, it does not appear in any sense that an effort was made to avoid timely judicial review of the retention of this patient; for within a week of the mandated hospital review of the patient’s status (Mental Hygiene Law § 9.25) an application was made to the court for a 60-day order of retention.
Under these circumstances, an order of discharge from the Hospital is not called for. Service upon Mental Hygiene Legal Services of the two-physician certificate dated June 25, 1991 issuing out of Manhattan State Hospital is sufficient, for the *474 purposes of this case to be deemed a "[njotice of the determination of the patient’s suitability” to remain a voluntary patient.
The Mental Hygiene Legal Services’ petition for Ms. A.’s release — although on other grounds — is deemed Ms. A.’s written demand for release; and a hearing shall be had as provided in Mental Hygiene Law § 9.13 for a voluntary patient seeking release.